*The Abell Foundation v. Baltimore Development Corporation, et al.*, No. 1890, Sept.
Term 2022.  Opinion by Arthur, J.

**MARYLAND PUBLIC INFORMATION ACT—EXEMPTION FOR
CONFIDENTIAL COMMERCIAL OR FINANCIAL INFORMATION**

Under the Maryland Public Information Act (the "MPIA"), Maryland Code (2014, 2019
Repl. Vol.), §§ 4-101 to -601 of the General Provisions Article ("GP"), the public is
generally entitled to "access to information about the affairs of government and the
official acts of public officials and employees."  GP § 4-103(a).  Under a statutory
exemption, however, a custodian must deny access when a record contains "confidential
commercial information" or "confidential financial information."  GP § 4-335.  The
MPIA does not define the term "confidential."

The MPIA was modeled after the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").
Consequently, Maryland courts generally give "significant weight" to federal courts'
interpretation of similar FOIA provisions.  *Amster v. Baker*, 453 Md. 68, 79 (2017).

FOIA contains an exemption that protects "trade secrets and commercial or financial
information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4)
("Exemption 4").  Like the Maryland statute, FOIA does not define the term
"confidential."

In 2019, the United States Supreme Court held that, "[a]t least where commercial or
financial information is both customarily and actually treated as private by its owner and
provided to the government under an assurance of privacy, the information is
'confidential' within the meaning of [FOIA's] Exemption 4."  *Food Marketing Inst. v.
Argus Leader Media*, 588 U.S. 427, 440 (2019).  The Appellate Court of Maryland
followed the United States Supreme Court's interpretation of the parallel federal statute
and adopted the federal interpretation of the term "confidential" in the MPIA exemption
for confidential commercial or financial information.

Circuit Court for Baltimore City
Case No. 24-C-18-001552

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1890

September Term, 2022

_____

THE ABELL FOUNDATION

V.

BALTIMORE DEVELOPMENT CORPORATION, ET
AL.

_____

Arthur,
Albright,
Wright, Alexander Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: August 2, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case involves a request for information under the Maryland Public Information Act (the "MPIA"), Maryland Code (2014, 2019 Repl. Vol.), §§ 4-101 to -601 of the General Provisions Article ("GP").

The MPIA states that the public is generally entitled to "access to information about the affairs of government and the official acts of public officials and employees." GP § 4-103(a). In some instances, however, the MPIA requires the custodian of a public record to deny access to a record. For example, a custodian must deny access when the record contains "confidential commercial information" or "confidential financial information." GP § 4-335. A custodian must also deny access when any part of a public record is "privileged or confidential," GP § 4-301, such as when the record is subject to the attorney-client privilege. *See Glass v. Anne Arundel County*, 453 Md. 201, 209 (2017); *Caffrey v. Dep't of Liquor Control for Montgomery County*, 370 Md. 272, 298 n.15 (2002). In addition, a custodian may deny access to "any part of an interagency or intra-agency letter or memorandum that would not be available by law to a private party in litigation with the unit," GP § 4-344, such as when the document is subject to the deliberative-process privilege. *See Glass v. Anne Arundel County*, 453 Md. at 210.[1]

The primary issue in this case is the disputed meaning of "confidential" commercial or financial information, a term that is not defined in the MPIA. GP § 4-335.

---

[1] The deliberative-process privilege "may prevent the disclosure of certain 'confidential advisory and deliberative communications between officials and those who assist them in formulating and deciding upon future governmental action.'" *Maryland Board of Physicians v. Geier*, 241 Md. App. 429, 464 (2019) (quoting *Hamilton v. Verdow*, 287 Md. 544, 588 (1980)).

Because the MPIA "was to some extent modeled" on the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), Maryland courts generally give "significant weight" to the federal courts' interpretation of similar provisions in FOIA. *See*, *e.g.*, *Amster v. Baker*, 453 Md. 68, 79 (2017); *accord Faulk v. State's Attorney for Harford County*, 299 Md. 493, 506 (1984); *MacPhail v. Comptroller*, 178 Md. App. 115, 119 (2008); *see also Stromberg Metal Works, Inc. v. University of Maryland*, 382 Md. 151, 164 (2004).

Much like the MPIA, FOIA contains an exemption that prohibits the disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4) ("FOIA Exemption 4"). Like the Maryland statute, FOIA does not define the term "confidential."

When this case began in 2018, the federal circuit courts of appeal had devised a two-tiered approach to determining whether commercial or financial information was "confidential" for purposes of FOIA's Exemption 4. Under that approach, the question depended on whether a party had voluntarily provided the information to the government or whether the party had been required to produce the information to the government. If a party had *voluntarily* provided commercial or financial information to the government, the information was considered "confidential" "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc). By contrast, if a party had been *required* to provide the information to the government, the information was considered "confidential" if its disclosure was likely to "cause substantial harm to the competitive position of the person from whom the

2

information was obtained." *See National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).

In *Amster v. Baker*, 453 Md. at 81, the Court adopted the so-called "*Critical Mass* test*"* for information that a party had *voluntarily* provided to a local government official. Thus, the Court held that "commercial information is 'confidential'—and therefore exempt from MPIA disclosure—if it 'would customarily not be released to the public by the person from whom it was obtained.'" *Id.* (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 879). Although *Amster* mentioned the so-called *National Parks* test,[2] which requires proof of the likelihood of substantial competitive harm before the government may withhold information that a party has been required to provide to it, the *Amster* Court had no occasion to adopt the *National Parks* test, because in that case the party had voluntarily provided the information at issue. *Id.* at 71. No opinion in Maryland has ever adopted the *National Parks* test.

While this case was pending in the Circuit Court for Baltimore City, the Supreme Court of the United States interpreted FOIA's Exemption 4 for the first time. *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427 (2019). In that case, the Court emphatically rejected the *National Parks* test and its requirement that the government show proof of the likelihood of substantial competitive harm before it withholds otherwise confidential commercial or financial information that it has compelled a party to provide. *Id.* at 435-40. The Court held that, "[a]t least where commercial or financial

---

[2] *Id.* at 78.

information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 440.

The case before us involves an MPIA request both for commercial or financial information that a party had been required to provide to Baltimore City and for commercial or financial information that the party had voluntarily provided to Baltimore City. Consequently, in this case, the circuit court was required to decide what standard should apply to the information that the party had been required to provide. The court predicted that the Maryland appellate courts would follow the United States Supreme Court's decision in *Argus Leader*.

Applying the standard announced in *Argus Leader*, the court concluded that the MPIA required Baltimore City not to disclose certain documents, because they contained "confidential" commercial or financial information. In a footnote, the court added that, even under the *National Parks* test that *Argus Leader* had rejected, the documents contained "confidential" commercial or financial information and, thus, the MPIA required the City not to disclose them. The court also concluded that the City properly withheld certain additional documents, because they were protected by the deliberative-process privilege and the attorney-client privilege.

This appeal ensued. We affirm.

## I. BACKGROUND

### A. The PILOT Agreement

In 2009, in connection with the construction of the Legg Mason Tower and an associated parking garage in Baltimore's Harbor East neighborhood, the City of Baltimore entered into a payment-in-lieu-of-taxes agreement (the "PILOT Agreement") with Harbor East Parcel D-Commercial, LLC (the "Developer").[3] The PILOT Agreement provided that for specified periods of time—15 years for the tower and 25 years for the garage—the properties would be largely exempt from the City's real property taxes. During this time, the City taxes would be calculated based on the pre-development value of the land on which the structures were situated, plus five percent of the tax assessment for the post-development value of the structures. The agreement had no effect on State real property taxes.

The PILOT Agreement required the Developer to submit financial information to the City, including the project's financing terms and annual audited financial statements.

---

[3] A PILOT agreement allows an economic development project to be exempted from the obligation to pay real property taxes within Baltimore City. Under Maryland Code (1986, 2019 Repl. Vol.), § 7-504.3 of the Tax-Property Article ("TP"), Baltimore City may enter into a PILOT agreement if certain conditions are met. Among other things, the developer of the project must demonstrate that: the City has conducted an economic analysis of the project; that the project will provide a public benefit; that there is financial necessity for the exemption; and that the private capital invested in the development meets designated thresholds. TP § 7-504.3(b)(1). In addition, the City must have authorized the project through a resolution that stipulates the project will not involve gambling activities. TP § 7-504.3(b)(2). If those criteria are met, the City and the developer of the project may enter into a PILOT agreement that reduces the developer's real property tax obligation for the term of the agreement. TP § 7-504.3(b)(3).

It also required the Developer to preserve its financial records for up to three years after each calendar year so that the City could inspect the records if it chose to do so. The City and the Developer later affirmed that the Developer submitted its financial records on the condition that the City would keep the records confidential.

In the PILOT Agreement, the City and the Developer established a profit-sharing arrangement. Under that arrangement, once the Developer had recouped an annual 15 percent return on the equity invested in the development, the City and the Developer would share in the net cash flow from the parking garage and the office building. In that event, the City would receive 25 percent of the net cash flow, and the Developer would receive the rest. The profit-sharing agreement would automatically expire after the PILOT term for each structure had ended; however, the City and the Developer could agree to terminate the profit-sharing arrangement at an earlier date.

In 2016, the Developer asked to buy out the City's rights under the profit-sharing provision. After reviewing internal-rate-of-return analyses ("IRR analyses") provided by the Developer, and after constructing its own model analysis to forecast the likely future returns, the Baltimore Development Corporation ("BDC"), a non-profit organization that serves as the economic development advisor to the City, concluded that the profit-sharing threshold would not be reached within the term of the PILOT Agreement. Based on this determination, in February 2017, the City and the Developer amended the PILOT Agreement, eliminating the profit-sharing provision in consideration for a $1.5 million payment from the Developer.

6

A month later, in March 2017, the Developer sold a majority interest in the Legg Mason Tower to another investor. One may infer that the impending sale had something to do with the Developer's interest in buying out the City's right to share in the profits.

## B. The MPIA Requests

On March 2, 2017, the Abell Foundation ("Abell"), which describes itself as "a charitable organization that works to ameliorate systemic challenges facing impoverished persons in Baltimore," sent an email to the BDC. The email stated that Abell was "interested in commissioning an independent analysis of the return to the City from the Legg Mason [T]ower PILOT." Abell asked what information the City could provide regarding the "return" that the City received from the PILOT Agreement. Abell requested the PILOT Agreement; an explanation of how the profit participation was computed and the frequency of profit-sharing payments; and information concerning when the profit-sharing agreement ended. Abell stated that it would be "helpful to review any net present value analysis that was performed together with [the] underlying assumptions and discount rate."[4] Abell also stated that it would be "helpful to review the most recent rent roll" for the Legg Mason Tower and three to five years of the Developer's "income and expense statements."

On March 24, 2017, the BDC responded in an email, in which it sent Abell the PILOT Agreement and the amendments to the agreement, as well as other "documents

---

[4] The term "net present value analysis" presumably refers to the net present value of the stream of income that the City could expect to receive under the profit-sharing agreement.

approved for release from the law department." Those documents included memorandums explaining how the profit participation is computed. The BDC asserted that it was unable to share any detailed analyses.

On April 4, 2017, Abell sent another email, stating that it needed much more information "[t]o perform the requisite financial analysis and formulate an opinion with respect to the reasonableness of the" City's decision to accept $1.5 million in exchange for the buy-out of its profit-sharing rights. Among other things, Abell requested information concerning the capitalization of the project, including the total project cost, the amount of equity and equity infusions that the Developer had contributed, and the amount, source, and terms of the debt financing that the Developer had assumed; the annual financial statements that the Developer was required to provide to the City; information about the amount of space in the building that the Developer had leased to Legg Mason, the expiration dates for those leases, the terms of the leases, and the amount of rent or income that was attributable to the Legg Mason leases; information about the historical occupancy rates for the Legg Mason Tower; and the rent roll for the building.

On June 30, 2017, an attorney for the City responded in an email, in which he declined to provide the specific financial information that Abell had requested. The attorney asserted that the information in question was "confidential proprietary, commercial or financial information, which [was] required to be withheld pursuant to GP Section 4-335" and that the disclosure of the information would cause substantial competitive harm to the Developer. In support of that assertion, the attorney cited *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 770 (D.C. Cir. 1974), which

8

held that, under FOIA's Exemption 4, commercial or financial information is confidential if its public disclosure is likely to impair the government's ability to obtain necessary information in the future or to cause substantial competitive harm to the position of the party from whom the information was obtained.

After its efforts to obtain more information proved unsuccessful, Abell submitted a formal MPIA request on December 1, 2017. In that request, Abell asked again for an extensive amount of financial information provided by the Developer to the City. The information requested included the total project cost; the amount of equity that the Developer invested in the project; the sources, terms, conditions, and amounts of the financing for the project; the Developer's audited financial statements with respect to the tower and the garage; any audited financial statements reflecting the net cash flow from the tower and the garage; and "[a]ny and all records relating to and/or documenting the actual or anticipated income generated or expenses incurred" by the tower or the garage, including the leases between the Developer and Legg Mason and any other lessees, documents reflecting the historical occupancy (or vacancy) rates, and any rent rolls. In addition, Abell requested information concerning the City's analysis of the profit-sharing buy-out; the City's analysis of the benefits and necessity of the development; the City's calculation of the amount of municipal taxes from which the Developer was annually exempted; and audited financial statements and supporting documents that may have demonstrated the City's annual entitlements to profit sharing.

On February 2, 2018, the City responded by producing additional records, which ultimately totaled about 600 pages, including redacted financial statements and auditor's

9

reports. Citing federal appellate decisions concerning FOIA's Exemption 4—*Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc); and *National Parks and Conservation Ass'n v. Morton*, 498 F.2d at 770—the City explained that it had withheld certain documents under GP § 4-335 because they would reveal confidential commercial or financial information. It also explained that it had withheld other records based on the attorney-client privilege and the deliberative-process privilege.

## C. The Circuit Court Case

### 1. Complaint

After receiving the City's final response and the records that it produced, Abell filed a complaint in the Circuit Court for Baltimore City. The defendants identified in Abell's complaint include the Baltimore Development Corporation; the Baltimore City Mayor's Office; the Baltimore City Department of Finance; the Baltimore City Council; the Baltimore City Board of Estimates; and the Baltimore City Law Department. For simplicity, we shall refer to these entities collectively as "the City."

In its complaint, Abell alleged that the City had violated the MPIA by withholding documents responsive to Abell's requests, by redacting information without explaining the basis for or the contents behind the redactions, and by failing to justify its application of the exemptions and privileges. Abell requested that the circuit court enter an order prohibiting the City from withholding public records and requiring the City to produce the requested materials.

10

## 2. Summary Judgment

The City responded to the complaint by moving to dismiss, or alternatively, for summary judgment. In its motion, the City argued that its responses had not violated the MPIA, because, it said, it had properly identified and explained the exemptions and privileges on which it had based its decision to decline to produce the records. The City also argued that it had correctly applied the exemptions and privileges. The City attached a *Vaughn* index,[5] which identified the documents that it had produced or withheld and the bases for redacting or withholding the documents.

When the City filed its summary judgment motion, *Amster v. Baker*, 453 Md. 68 (2017), was the leading case on the issue of what information qualified as "confidential" for purposes of the MPIA's exemption for confidential commercial or financial information. In *Amster* the Court recognized the similarity between the MPIA's exemption for confidential commercial information and FOIA Exemption 4. *Id.* at 77-81. Consequently, the Court discussed the analytical structure that the federal appellate courts had devised to determine what qualified as "confidential." *Id.* Under that structure, the test for determining whether records were confidential depended on an extra-textual

---

[5] When a government agency denies a request for a public record and the requestor seeks judicial review, the circuit court "may require the agency to submit a listing of the withheld records and the basis for withholding each record[.]" *Glass v. Anne Arundel County*, 453 Md. 201, 213 (2017). This listing, which may include the identification of "documents in [the government's] possession, setting forth the date, author, general subject matter, and claim of privilege for each document claimed to be exempt from [disclosure]," is referred to as a *Vaughn* index, "derived from *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)." *Glass v. Anne Arundel County*, 453 Md. at 213 n.11.

11

distinction between whether a person had voluntarily provided the information to the government or whether the person had been compelled to provide the information.

As previously mentioned, the federal courts had held that when a person had been compelled to provide commercial or financial information to the government, the information was "'confidential' for purposes of the exemption" if its disclosure was likely to "impair the [g]overnment's ability to obtain necessary information in the future" or to "cause substantial harm to the competitive position of the person from whom the information was obtained." *See, e.g.*, *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). On the other hand, if a person had voluntarily provided commercial or financial information to the government, the information was confidential for purposes of the exemption "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc). In *Amster v. Baker*, 453 Md. at 81, the Court adopted and applied the latter test— the *Critical Mass* test—to information that a party voluntarily provided to a local government official.

In its motion to dismiss or for summary judgment in this case, the City argued that under GP § 4-335 it was required to redact or withhold the private financial data that the Developer had been required to provide to the City—specifically, the Developer's financial statements, the Developer's IRR analyses, and an estoppel certificate that recited the total equity invested in the project. Invoking the *National Parks* test, the City argued that the disclosure of this private financial data would likely cause substantial

12

harm to the Developer's competitive position and would likely impair the City's ability to obtain similar information in the future. The City supported its explanation of the potential harm with lengthy and detailed affidavits from representatives of the Developer and of the BDC.

The City also argued that it was required to redact or withhold the private financial data that the Developer had voluntarily provided to the City, such as the IRR analyses that the Developer voluntarily provided to the City during the negotiations that led to the buy-out of the City's profit-sharing rights. Under the *Critical Mass* test, the City argued, that information was confidential because the Developer would not customarily release it to the public. Again, the City supported its assertion with a lengthy and detailed affidavit from a representative of the Developer.

The City went on to argue that it had correctly applied the deliberative-process privilege in withholding the model analysis that it performed to determine whether to accept a buy-out of its profit-sharing rights under the PILOT Agreement. The City argued that the deliberative-process privilege applied because the materials withheld were used to inform the City's decision-making process and represented the "type of model, methods, and processes" that the City used to evaluate all similar PILOT agreements, and its disclosure would harm the City's negotiation power in future transactions. The City relied on the affidavit from the BDC to explain how the model analysis was created, how the City used the analysis to support its decisions, and how the City might suffer harm because of its disclosure.

13

The City argued that it had properly withheld materials under the attorney-client privilege because there was an attorney-client relationship between the authors of the communications, and the contents of the communications concerned legal advice. The City relied on its *Vaughn* index and on its MPIA response to support its argument that the communications in question qualified as attorney-client materials.

Finally, the City argued that its application of the bases on which it withheld records were pure questions of law. Because it claimed to have properly applied the exemptions and privileges, the City asserted that it was entitled to judgment as a matter of law.

Abell disagreed with the City's analysis. It argued that the *National Parks* test alone should apply in determining confidentiality under GP § 4-335. In Abell's view, there was no evidence that the City had independently evaluated whether competitive financial harm was likely to result if the Developer's financial data documents were released or that releasing the financial information would impair the City's ability to obtain similar information in the future. Abell did not dispute the assertions in the affidavits from the BDC and the Developer, which identified the risks of substantial competitive harm and of the difficulty in obtaining similar information in the future. Instead, Abell dismissed the affidavits on the ground that they were "not credible." Under *National Parks*, Abell concluded, the information was not confidential and should not have been withheld.

Abell also disagreed with the City's position that the deliberative-process privilege applied to the model analysis. The City, Abell argued, did not demonstrate that the

14

model analysis reflected any deliberations by decision-makers or that its disclosure would impair discussion among decision-makers.

Abell also argued that the City had not demonstrated the applicability of the attorney-client privilege to the documents for which it sought that protection. Abell claimed that there was a genuine dispute of material fact about whether the City had fully disclosed all the documents that were responsive to the MPIA request. Finally, Abell argued that it should be allowed to pursue discovery to determine whether the City had appropriately conducted its search for documents and whether it had correctly applied the exemptions and privileges.

### 3. Motion to Intervene

Simultaneously with the City's appearance in the case, the Developer moved to intervene. The Developer stated that it needed to intervene because it had an interest in ensuring that "its confidential financial information [was] not disclosed to the public." The Developer also stated that it had not released that information to the public and that the disclosure of that information would cause "substantial harm" to its competitive position. As an exhibit to its motion, the Developer attached a motion to dismiss or for summary judgment, in which it joined in the City's motion. The Developer agreed with

15

the City that the documents sought by Abell were confidential commercial or financial information and were properly withheld.

### 4. The Hearing

The parties attended a hearing on June 6, 2018, where they restated the positions in their briefings. Over Abell's objection, the circuit court granted the Developer's request to intervene.

### 5. *Argus Leader*

Between the time of the motions hearing and the time when the court issued its decision in 2022, the United States Supreme Court decided *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019). In *Argus Leader* the Court rejected the *National Parks* test and its dictate that some information cannot be "confidential," for purposes of Exemption 4, unless its disclosure is likely to result in "substantial competitive harm." *Id.* at 430; *see id.* at 440 (holding that, "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4").

In *Argus Leader* a newspaper filed a FOIA request for the "SNAP redemption data"—data pertaining to the dollar amount of food stamp purchases under the Supplemental Nutrition Assistance Program, or "SNAP"—at individual retail stores. *Id.* at 430. Citing Exemption 4, the United States Department of Agriculture declined to provide store-level data. *Id.* at 431. In response, the newspaper filed suit. *Id.* Relying on *National Parks*, the federal district court compelled the production of store-level data,

16

because the government had not proved "substantial competitive harm." *Id.* at 432. A federal appellate court affirmed. *Id.*

On certiorari, the Supreme Court began its analysis with the plain language of Exemption 4. That exemption, the Court said, "shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or confidential.'" *Id.* at 433. The Court observed that FOIA does not define the term "confidential." *Id.* Consequently, the Court turned to dictionary definitions from around the time of the statute's enactment in 1966 to ascertain the "'ordinary, contemporary, common meaning'" of the term. *Id.* at 433-34 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

From its review of the dictionaries, the Court identified "two conditions that might be required for information communicated to another to be considered confidential." *Id.* at 434. First, "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." *Id.* Second, "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.*

The Court opined that the first condition must be met for the exemption to apply, because "it is hard to see how information could be deemed confidential if its owner shares it freely." *Id.* In the Court's view, there was "no question" that the retailers had satisfied that condition. *Id.*

The Court found it unnecessary to decide whether the second condition must be met—i.e., whether privately held information might "*lose* its confidential character for

17

purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private"—because the retailers had "clearly satisif[ied]" that condition as well. *Id.* at 434-35 (emphasis in original). "Presumably to induce retailers to participate in SNAP and provide store-level information it finds useful to its adminstration [sic] of the program, the government has long promised them that it will keep their information private." *Id.* at 435.

At this juncture, the Court inquired into the source of the rule that at least some information is not "confidential," within the meaning of Exemption 4, unless its disclosure would cause "substantial competitive harm." The Court observed that the requirement of "substantial competitive harm" was "[n]otably lacking from dictionary definitions, early case law, or any other usual source that might shed light on the statute's ordinary meaning[.]" *Id.* The requirement, the Court remarked, had been "engrafted" onto Exemption 4. *Id.* at 431.

As the Court saw it, the Court of Appeals for the D.C. Circuit, in *National Parks*, had simply "declared that, in addition to the requirements actually set forth in Exemption 4, a 'court must also be satisfied that non-disclosure is justified by the legislative purpose which underlies the exemption.'" *Id.* at 436 (quoting *National Parks & Conservation Ass'n v. Morton*, 498 F.2d at 767). "Then, after a selective tour through the legislative history," the *National Parks* court had "concluded that 'commercial or financial matter is "confidential" [only] if disclosure of the information is likely . . . (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information

18

was obtained.'" *Id.* (quoting *National Parks & Conservation Ass'n v. Morton*, 498 F.2d at 770). "Without much independent analysis," the Court said, other courts "fell in line and adopted variants of the *National Parks* test." *Id.*

The Court expressed its disapproval of what it called the "disregard" of the current "rules of statutory interpretation" in *National Parks*. *Id.* "In statutory interpretation disputes," the Court wrote, "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Id.* (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011)). Where "that examination yields a clear answer," as it did with Exemption 4, "judges must stop." *Id.* (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)). Judges may not use legislative history to "'muddy' the meaning of 'clear statutory language.'" *See id.* (quoting *Milner v. Department of Navy*, 562 U.S. 562, 572 (2011)).

In the Court's view, the "contrary approach" in *National Parks* "is a relic from a 'bygone era of statutory construction.'" *Id.* at 437 (quoting Brief for United States as *Amicus Curiae* at 19). "Not only did *National Parks* inappropriately resort to legislative history before consulting the statute's text and structure, [but] once it did so it went even further astray." *Id.* For instance, the *National Parks* court "relied heavily on statements from witnesses in congressional hearings years earlier on a different bill that was never enacted into law." *Id.*

The Court added that, "[u]nsurprisingly, *National Parks* has drawn considerable criticism over the years." *Id.* The Court cited the concurring opinion in the original panel decision in *Critical Mass*, which charged that the *National Parks* test had been

19

"'fabricated . . . out of whole cloth.'" *Id.* (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 931 F.2d 939, 947 (D.C. Cir. 1991) (Randolph, J., concurring)).[6]

The Court observed that in *Critical Mass*, in 1992, the D.C. Circuit had retained *National Parks* "principally as a matter of *stare decisis* in the context of information a private entity is *required* to provide to the government," but that the court had "pointedly declined to extend the *National Parks* test to information provided *voluntarily* to the government under Exemption 4." *Id.* at 437-38 (emphasis in original). Instead, in *Critical Mass*, the D.C. Circuit had "adhered to a much more traditional understanding of the statutory term 'confidential,' holding that information qualifies as confidential 'if it is of a kind that would customarily not be released to the public by the person from whom it was obtained.'" *Id.* at 438 (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879-80 (D.C. Cir. 1992) (en banc)). "[U]nbound by D.C. Circuit precedent," the Supreme Court could discern no "persuasive reason to afford the *same* statutory term two such radically different constructions." *Id.* (emphasis in original).

The Court rejected a set of arguments that would "salvage the result, if not the reasoning, of *National Parks*." *Id.* The Court disagreed that the language of Exemption 4 included a common-law "term of art" that applied only to "information whose release would lead to substantial competitive harm." *Id.* It also disagreed that Congress had "effectively ratified" *National Parks*' understanding of the term "confidential" by

---

[6] The concurring opinion attributed that charge to Note, *Trade Secrets and the Fifth Amendment*, 54 U. Chi. L. Rev. 334, 364 (1987).

enacting statutes that used similar phrases in the years since *National Parks* was decided. *Id.* at 439. Finally, it disagreed that it should import a requirement of "substantial competitive harm" into the statute as a means of narrowly construing the FOIA exemptions. *Id.* The Court explained that, "just as we cannot properly *expand* Exemption 4 beyond what its terms permit, we cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms." *Id.* (emphasis in original) (citation omitted).

In conclusion, the Court held that, "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 440.

Justice Breyer, joined by Justices Ginsburg and Sotomayor, concurred in part and dissented in part. Justice Breyer agreed that "nothing in FOIA's language, purposes, or history" imposes the "stringent" requirement of proof of "'substantial' competitive harm." *Id.* at 442 (Breyer, J., concurring in part and dissenting in part). "Accordingly," Justice Breyer "would clarify that a private harm need not be 'substantial' so long as it is genuine." *Id.* "On the other hand," Justice Breyer disagreed that Exemption 4 imposes no "'harm' requirement whatsoever." *Id.*

The opinion of the Court rejected Justice Breyer's contention because neither party had advocated for it, and because (in the majority's view) it "boil[ed] down to a policy argument about the benefits of broad disclosure." *Id.* at 440 (majority opinion).

The majority declined to "*constrict*" Exemption 4 "by adding limitations found nowhere in its terms." *Id.* at 439 (emphasis in original).

### 6. The Circuit Court's Decision

On November 14, 2022, the circuit court issued a 27-page decision in this case. After recounting the factual and procedural history, the circuit court said that it would treat the motion as a motion for summary judgment because the parties relied on documents outside the pleadings. It proceeded to grant summary judgment in the City's favor.

The circuit court began by considering which test to apply in determining whether the City had withheld confidential commercial or financial information. The court noted that in *Amster v. Baker*, 453 Md. at 77-78, the Court had "adopted as Maryland law the analytical structure developed in federal cases interpreting the parallel [FOIA] exemption . . . , commonly referred to as Exemption 4." The court recounted the history of the federal cases that had interpreted Exemption 4, beginning with *National Parks*, which imposed the requirement of substantial competitive harm before information could be deemed "confidential," and continuing through *Critical Mass*, which limited *National Parks* to cases in which a person had been compelled to provide information to the government. The court recognized that, under *Critical Mass*, information voluntarily provided to the government would remain confidential as long it "'would customarily not be released to the public by the person from whom it was obtained[.]'" *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 878 (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971)) (further citation omitted). The court

22

also recognized that in *Argus Leader* the Supreme Court overruled *National Parks*, abolished the distinction between information that someone had voluntarily provided and information that they had been compelled to provide, and jettisoned any requirement that the government prove "substantial competitive harm" before some information would be deemed "confidential." And the court recognized that all nine justices agreed that the requirement of "substantial" competitive harm "could not be justified."

Because *Argus Leader* postdated *Amster v. Baker*, the court was required to decide whether Maryland's appellate courts would follow the Supreme Court's interpretation of Exemption 4. The court concluded that they would.

In support of its conclusion, the court noted, first, that in *Amster v. Baker*, 453 Md. at 81, the Court had applied the *Critical Mass* test (because the documents in question had been voluntarily provided to the government), and not the *National Parks* test that the Supreme Court later rejected in *Argus Leader*. Thus, the court reasoned that *Argus Leader* was "not inconsistent" with *Amster v. Baker*.[7] Second, the court noted that in

---

[7] *Argus Leader* held that, "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 440. The Court found it unnecessary to decide whether "privately held information [can] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[.]" *Id.* at 434-35 (emphasis in original). *Critical Mass* held that information voluntarily provided to the government is "confidential," within the meaning of Exemption 4, if it "would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 878 (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971)) (further citation omitted).

*Amster v. Baker*, 453 Md. at 79-81, the Court had "broadly endorsed the parallels" between Exemption 4 and "the MPIA['s] exemption for confidential commercial and financial information." The court found it "unlikely" that Maryland's appellate courts would "depart" from the United States Supreme Court's interpretation of the "parallel federal statute," particularly given that all nine of the justices had supported the elimination of the requirement of "substantial competitive harm." Thus, the court concluded that Maryland's appellate courts were "likely to adopt" the reasoning of *Argus Leader* and to apply it to all MPIA "cases involving the exemption for confidential commercial or financial information."

The court held that the documents at issue "clearly" met the standard announced in *Argus Leader*. The court wrote that the financial statements, the IRR analyses for 2011 through 2015, and the estoppel certificate that recited the total equity invested in the project "are the type of financial records that almost any private commercial entity is likely to treat as confidential[.]" The court added that the Developer's affidavit confirmed that it had treated the records as confidential and that the BDC's affidavit confirmed that the Developer had provided the records "with an explicit expectation" that BDC would keep them confidential.

The circuit court considered Abell's two arguments against the affidavits: that Abell was entitled to conduct discovery before the court considered the affidavits; and

---

As the *Critical Mass* test adopted in *Amster* is commensurate with the first condition from *Argus Leader*, these tests are not inconsistent.

24

that the affidavits were "self-serving" and therefore not credible.  The court saw no "serious possibility" that discovery would change what the affiants had said.  As to the assertion that the affidavits were not credible, the court explained that there was no contrary testimony and, thus, that the assertions contained in the affidavits were undisputed.

In a footnote, the court remarked that if it were required to apply the "stricter" *National Parks* test, it would have held that the disclosure of the requested materials would pose "a likely risk of substantial harm to [the Developer's] competitive position." In the body of the opinion, the court discussed the Developer's affidavit, which detailed how other landlords, tenants and prospective tenants, and vendors could use the confidential information in the documents to their advantage, and to the Developer's detriment.

The court turned to the question of whether the BDC's model analysis fell within the deliberative-process privilege, so that the City was permitted to withhold it under GP § 4-344.[8]  The privilege, said the court, applies to pre-decisional communications when disclosure would be "injurious to the consultative functions of government."  *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  The circuit court agreed with the City that the BDC's model analysis "fits well within the scope of this discretionary protection[,]" because it was a pre-decisional document that the BDC

---

[8] The court perceived that, to the extent that the model analysis directly disclosed the Developer's confidential information, the City was required to withhold it under the MPIA exemption for confidential commercial or financial information.

25

prepared and used in deciding whether to approve a buy-out of the City's profit-sharing rights under the PILOT Agreement. Additionally, the court cited the BDC's affidavit, which demonstrated that "disclosing the BDC's internal methodology would do significant harm to [its] ability" to make future decisions regarding modification of PILOT agreements. The circuit court concluded that the City had properly applied the deliberative-process exemption to the entire model analysis.

As to the City's invocation of the attorney-client privilege as the basis to withhold the two memorandums from 2009, the circuit court concluded that the City had not sufficiently described the materials to demonstrate that they qualified as legal advice. The court acknowledged that it could require the disclosure of the memorandums because of the City's failure to demonstrate that the privilege applied. But because of the "importance of the privilege to the client[,]" the circuit court instead required the City to submit the documents for an *in camera* inspection.

Following its *in camera* review, the circuit court issued a supplemental opinion on November 30, 2022. There, the court explained that both of the memorandums contained the author's legal analyses and advice to its recipients—all of whom were employees of the City's Department of Finance or the BDC, and therefore qualified as clients. The court noted that the second memorandum contained handwritten notes that were "integral" to the matters discussed in the memorandum. Although the author of the notes was not identified, the court concluded that the document qualified as confidential legal advice because the notes related to the legal analysis and advice from the author.

26

On November 30, 2022, the court issued an order granting summary judgment to the City on all issues. Abell filed a timely notice of appeal.

## II. QUESTIONS PRESENTED

Abell has presented the following questions, which we have reworded and rephrased for concision:

I. Whether the circuit court erred in holding that the City properly applied the confidential commercial or financial information exemption when it withheld materials from its MPIA production.

II. Whether the circuit court erred in holding that the City properly applied the deliberative-process privilege when it withheld the model analysis from its MPIA production.

III. Whether the circuit court erred in holding that the City properly applied the attorney-client privilege when it withheld memorandums written by City lawyers from its MPIA production.

IV. Whether the Circuit Court erred in granting summary judgment when Abell claimed that additional unidentified documents existed but had been withheld.[9]

---

[9] Abell phrased its questions as follows:

I. Whether the Circuit Court erred in holding that the City properly withheld public records relating to the City's decision to grant tens of millions of dollars in tax breaks to a private developer under the MPIA's exemption for confidential commercial or financial information without showing that disclosure of that information is likely to result in substantial competitive harm to the developer.

II. Whether the Circuit Court erred in holding that the City properly withheld a public record under the deliberative-process privilege, notwithstanding the City's failure to show that the record was "deliberative" or that it contained or reflected any conclusions, recommendations or consultative views of any City official.

27

### III.   STANDARD OF REVIEW

This case presents issues of statutory interpretation, which we review without deference to the circuit court.  *See*, *e.g.*, *Hoang v. Lowery*, 469 Md. 95, 104 (2020). When a circuit court decides a summary judgment motion based "on a determination of law rather than fact, we review such a determination without deference[.]"  *Glass v. Anne Arundel County*, 453 Md. 201, 231 (2017); *accord Amster v. Baker*, 453 Md. at 75.

"In FOIA cases, the trial court 'may grant summary judgment on the basis of government affidavits or declarations that explain why requested information falls within a claimed exemption, as long as the affidavits or declarations are sufficiently detailed, non-conclusory, and submitted in good faith, and as long as a plaintiff has no significant basis for questioning their reliability.'"  *Prince George's County v. Washington Post Co.*, 149 Md. App. 289, 305 (2003) (quoting *Center for Nat'l Sec. Studies v. United States Dep't of Justice*, 215 F. Supp. 2d 94, 99 (D.D.C. 2002)).  This Court has applied that standard in cases involving the MPIA.  *Id.*

"The party opposing a summary judgment motion must 'identify with particularity' each factual dispute and must 'identify and attach' the supporting evidentiary materials."  *Gurbani v. Johns Hopkins Health Sys. Corp.*, 237 Md. App. 261,

III. Whether the Circuit Court erred in finding memorandums containing handwritten notations by unidentified authors [were] properly withheld under the attorney-client privilege.

IV. Whether the Circuit Court erred in granting summary judgment for Appellees notwithstanding the City's failure to explain the basis for its withholding of several responsive documents identified in the record.

290 (2018) (quoting Md. Rule 2-501(b)). "Accordingly, 'mere general allegations or conclusory assertions which do not show facts in detail and with precision will not suffice to overcome a motion for summary judgment.'" *Id.* (quoting *Educ. Testing Serv. v. Hildebrant*, 399 Md. 128, 139 (2007)). "Where the moving party attests to a material fact, the non-moving party must do more than simply show some 'conjectural' or 'metaphysical' doubt as to that fact." *Id.* at 291 (quoting *Windesheim v. Larocca*, 443 Md. 312, 329-30 (2015)) (citations and quotation marks omitted). "A plaintiff's claim must be supported by more than a 'scintilla of evidence[,]' as 'there must be evidence upon which [a] jury could reasonably find for the plaintiff.'" *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 108 (2014) (quoting *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738-39 (1993)).

## IV.  DISCUSSION

### A. The Circuit Court Did Not Err in Holding that the City Properly Withheld Confidential Commercial or Financial Information from its MPIA Production

To evaluate whether the circuit court erred in holding that the City correctly applied the MPIA's exemption for confidential commercial or financial information, we must first determine the meaning of the term "confidential." Each party has a different position as to which test is correct.

Abell argues that *Argus Leader* is inconsistent with Maryland law and with the policy underlying the MPIA because, in its view, the requirement of a showing of substantial competitive harm is incorporated into the MPIA through the common-law understanding of the terms "trade secrets" and "confidential commercial information" at

29

the time when the MPIA was enacted. Therefore, Abell argues, we should apply the substantial competitive harm test from *National Parks* and reverse.

The City argues that we should adopt the *Argus Leader* test because of the weight Maryland gives to federal interpretations of similar FOIA provisions, and because the United States Supreme Court's statutory analysis mirrors the analysis required under Maryland law. The City also argues that because the disclosure of the information would indisputably have resulted in substantial competitive harm to the Developer, the information was "confidential" even under the *National Parks* test, so that further analysis of GP § 4-335 was unnecessary. The Developer argues that the MPIA, like FOIA, makes no mention of a showing of harm; therefore, the Developer advocates that we affirm the circuit court's ruling on this basis and adopt *Argus Leader*.

We turn first to the question of whether the circuit court erred in following *Argus Leader* in interpreting the terms "confidential commercial information" and "confidential financial information" in the MPIA. We conclude that the circuit court did not err.

"[T]he MPIA 'was to some extent modeled after the [FOIA], and the purpose of the MPIA is virtually identical to that of the FOIA.'" *Amster v. Baker*, 453 Md. at 79 (quoting *Immanuel v. Comptroller of Md.*, 449 Md. 76, 89 (2016)); *accord Prince George's County v. Washington Post Co.*, 149 Md. App. 289, 305 (2003) (stating that "[t]he MPIA . . . was modeled after the federal Freedom of Information Act"). Furthermore, "[t]he provisions of the MPIA are almost verbatim those of the FOIA." *Blythe v. State*, 161 Md. App. 492, 513 (2005).

30

In Maryland's only reported case examining the MPIA's exemption for confidential commercial or financial information, the Court stated that, "when interpreting the MPIA, we generally give significant weight to the federal courts' interpretation of similar FOIA provisions." *Amster v. Baker*, 453 Md. at 79. In that same case, the Court used federal cases interpreting FOIA's Exemption 4 to interpret the MPIA's exemption for confidential commercial or financial information. *Id.* As Maryland has demonstrated that it views federal authority interpreting Exemption 4 as persuasive in interpreting the MPIA's parallel version of the exemption, it is consistent with *Amster* to look to new developments in federal law, particularly when the Supreme Court of the United States is the authority weighing the issue.

Furthermore, Maryland's approach to statutory interpretation is similar to the approach undertaken by the Supreme Court in *Argus Leader*. Like the Supreme Court in *Argus Leader*,[10] "'we begin with the normal, plain meaning of the language of the statute.'" *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 178-79 (2022) (quoting *Lockshin v. Semsker*, 412 Md. 257, 275 (2010)). The meaning of the "plain language" is controlled by the context in which it appears. *See id.* at 179. As in the federal system,[11] "'[i]f there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.'" *75-80*

---

[10] *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 436 (stating that "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself").

[11] *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 436 (stating that "[w]here . . . that examination yields a clear answer, judges must stop").

*Properties, L.L.C. v. Rale, Inc.*, 470 Md. 598, 624 (2020) (quoting *Lillian C. Blentlinger,*

*LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 294 (2017)).

"'In seeking to apply the plain[ ]meaning rule, it is proper" for a Maryland court

"to consult a dictionary or dictionaries for a term's ordinary and popular meaning.'"

*Hoang v. Lowery*, 469 Md. 95, 120 (2020) (quoting *Ali v. CIT Tech. Fin. Servs., Inc.*, 416

Md. 249, 262 (2010)); *accord Whitley v. Maryland State Bd. of Elections*, 429 Md. 132,

152 n.28 (2012). "'In choosing the dictionary or dictionaries from which to glean

assistance, we consult those editions (in addition to current editions) of dictionaries that

were extant at the time of the pertinent legislative enactments.'" *Hoang v. Lowery*, 469

Md. at 120 (quoting *Ali v. CIT Tech. Fin. Servs., Inc.*, 416 Md. at 262; *accord Doe v.*

*Catholic Relief Services*, 484 Md. 640, 654-55 (2023); *Whitley v. Maryland State Bd. of*

*Elections*, 429 Md. at 152 n.28.

In *Argus Leader* the United States Supreme Court examined dictionaries

contemporaneous with the enactment of FOIA for the definition of the term

"confidential":

> The term "confidential" meant then, as it does now, "private" or "secret."
> Webster's Seventh New Collegiate Dictionary 174 (1963). Contemporary
> dictionaries suggest two conditions that might be required for information
> communicated to another to be considered confidential. In one sense,
> information communicated to another remains confidential whenever it is
> customarily kept private, or at least closely held, by the person imparting it.
> See, *e.g.*, Webster's Third New International Dictionary 476 (1961)
> ("known only to a limited few" or "not publicly disseminated"); Black's
> Law Dictionary 370 (rev. 4th ed. 1968) ("intended to be held in confidence
> or kept secret"). In another sense, information might be considered
> confidential only if the party receiving it provides some assurance that it
> will remain secret. See, *e.g.*, 1 Oxford Universal Dictionary Illustrated 367

(3d ed. 1961) ("spoken or written in confidence"); Webster's New World Dictionary 158 (1960) ("told in confidence").

*Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 434.[12]

None of these definitions includes any suggestion that a showing of competitive harm is required for information to qualify as confidential.

In "engraft[ing]"[13] a requirement of "competitive harm" onto FOIA Exemption 4 in *National Parks*, the D.C. Circuit went about the task of statutory interpretation in the wrong way. The court did not inquire into the ordinary meaning of the term "confidential" at the time when FOIA was enacted by, for example, consulting dictionary definitions from that time. Instead, the court looked to the legislative history of the statute. Yet, in Maryland, as in the contemporary federal system,[14] we typically consult legislative history only after determining that a statute is ambiguous.[15]

In short, *National Park*s is, as the United States Supreme Court said, "a relic from a 'bygone era of statutory construction'" (*Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 437) because it purports to divine the meaning of an unambiguous statutory term, not by ascertaining its ordinary meaning at the time of the enactment, but by

---

[12] FOIA was enacted in 1966, four years before the MPIA. The dictionaries examined by the Supreme Court in *Argus Leader* were among the most current, contemporary editions that existed when the MPIA was passed.

[13] *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 431.

[14] *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 436.

[15] A court, however, may "use legislative history as a 'check' on its plain text interpretation." *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. at 190; *accord Doe v. Catholic Relief Servs*., 484 Md. at 656.

synthesizing various statements made during the legislative process. Were we to follow *National Parks*, the statutory term "confidential" would have different meanings depending upon an extra-textual distinction between whether a person voluntarily provided information to the government or provided it under compulsion. We decline to import *National Parks*' fallacious conclusion into Maryland law. As the City argues, "there is no reason to favor an abrogated 1974 circuit court decision over a 2019 decision by the highest judicial authority."

Instead, we follow *Argus Leader*. Consequently, we conclude that a custodian need not establish that a party is likely to suffer "substantial competitive harm" before it may withhold "confidential commercial information" or "confidential financial information" under GP § 4-335. The exemption in § 4-335 will apply at least as long as the information in question is legitimately "confidential" in the sense that it "is customarily kept private, or at least closely held, by the person imparting it," and "the party receiving the information provides some assurance that it will remain secret." *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 434.

In arguing that the circuit court erred in not following the abrogated *National Parks* test, Abell makes three points, some of which echo the points that the United States Supreme Court rejected in *Argus Leader*.

Abell argues, first, that the language of GP § 4-355 differs from that of FOIA Exemption 4 and that the specific language of the Maryland statute—"confidential commercial information"—is a common-law term of art that denotes non-public information whose disclosure would cause competitive harm. In support of that

34

contention, Abell relies prominently on two secondary authorities—the Restatement of Torts § 757 cmt. b (1939) and the Restatement of Agency § 396 (1933)—neither of which employ the term "substantial competitive harm." Abell also relies on the 1970 amendments to Rule 26 of the Federal Rules of Civil Procedure, which permitted a court to issue a protective order to limit the disclosure of "trade secrets" or "confidential commercial information." Yet, nothing in the amendments, or in the cases cited in the advisory committee notes to the 1970 amendments,[16] equates "confidential commercial information" with non-public information whose disclosure would cause competitive harm. Finally, Abell cites cases such as *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118 (1967), which concern injunctions to restrain the breach of restrictive covenants—a remedy that necessarily involves some balancing of the harm that the employer may suffer as a result of the alleged breach against the employee's interest in earning a living. Those cases, too, do not equate "confidential commercial information" with non-public information whose disclosure would cause competitive harm.

Second, Abell argues that, when the General Assembly amended and recodified the MPIA in 2014, it "ratified" the *National Parks* test and "the long-held understanding that 'confidential commercial information'" is information that "would cause competitive harm if disclosed." The General Assembly, however, could not have "ratified" *National*

---

[16] *E.g.*, *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d 993, 999 (10th Cir. 1965); *Julius M. Ames Co. v. Bostitch*, 235 F. Supp. 856, 857 (S.D.N.Y. 1964). As the Developer observes, the parties to those cases argued that the disclosure of information would cause harm, but the courts did not hold that Rule 26 required a showing of competitive harm.

*Parks* in 2014 because no Maryland case had ever mentioned *National Parks* until

*Amster v. Baker* in 2017[17]—and even then, the Court had no occasion actually to adopt

the *National Parks* test. Nor did the General Assembly ratify *National Parks* by

acquiescing in the language of the Maryland Public Information Act Manual, a self-

described "resource"[18] in which the Attorney General has advised government custodians

to use the *National Parks* test in some instances.[19] "Although Opinions of the Attorney

General have a clearly established place in the firmament of Maryland law, the MPIA

Manual does not." *Action Comm. for Transit, Inc. v. Town of Chevy Chase*, 229 Md.

---

[17] *Wadsworth v. Sharma*, 479 Md. 606, 622 (2022) (expressing a presumption that "the General Assembly is 'aware of *this Court's* interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation'") (quoting *Williams v. State*, 292 Md. 201, 210 (1981)) (emphasis added).

[18] Off. of the Md. Att'y Gen., Maryland Public Information Act Manual, Preface (18th ed., Oct. 2023), available at https://www.marylandattorneygeneral.gov/OpenGov%20Documents/PIA_manual_printable.pdf (archived at https://perma.cc/DR93-5EH9).

[19] In its current iteration, the MPIA Manual states that *Argus Leader* "is not inconsistent with the test adopted by Maryland's Supreme Court in *Amster*, which treats commercial information that is voluntarily supplied to the government as confidential if its owner does not customarily make the information public." Off. of the Md. Att'y Gen., Maryland Public Information Act Manual, at 3-28 (18th ed., Oct. 2023), available at https://www.marylandattorneygeneral.gov/OpenGov%20Documents/PIA_manual_printable.pdf (archived at https://perma.cc/DR93-5EH9). The Manual adds that "there is nothing in Maryland law that would *require* the Court to depart from the *National Parks* test, which the Court favorably cited (though did not expressly adopt) in its *Amster* decision." *Id.* (emphasis in original). "Thus," the Manual states, "there is at least some question as to whether the Supreme Court of Maryland will adopt the new *Argus Leader* test or the *National Parks* test with respect to information required to be supplied to the government." *Id.* "Unless and until the Court decides that issue," the Manual currently concludes, "the safest course for custodians faced with a request for commercial information that was required to be provided to the government is to consider how both the *National Parks* test and the *Argus Leader* test would apply." *Id.*

App. 540, 557 n.20 (2016). The General Assembly could not ratify an opinion that the Attorney General never gave.

Abell argues that in other statutes the General Assembly has "designated materials as 'confidential commercial information' protected by the MPIA's exemption in a manner that would be unnecessary if a showing of competitive harm was not required." Abell cites Maryland Code (1982, 2023 Repl. Vol.) § 2-803 of the Health General ("HG") Article, under which the manufacturer or wholesale distributor of certain generic or off-patent drugs may be required to submit information in response to allegations of price-gouging. Abell focuses on HG § 8-203(f), which states: "Any information provided by a manufacturer or a wholesale distributor to the Attorney General under subsections (b) and (c) of this section shall be considered confidential commercial information for purposes of § 4-335 of the General Provisions Article unless the confidentiality of the information is waived by the manufacturer or wholesale distributor." We fail to see how the General Assembly silently incorporated a requirement of substantial competitive harm into GP § 4-335 when it allowed a manufacturer or a wholesale distributor of generic or off-patent drugs to waive a claim that it had been required to produce confidential commercial information.

Abell claims to find support in two provisions pertaining to insurance regulation. It cites Maryland Code (1995, 2017 Repl. Vol., Supp. 2023) § 4-405(a)(2) of the Insurance Article, which permits insurers to "notify the [Insurance] Commissioner of any information that the insurer considers proprietary" in its mandatory reports. It also cites § 11-603(c)(3)(ii) of the Insurance Article, which permits insurers to "request a finding by

37

the [Insurance] Commissioner that certain information filed with the Commissioner be considered confidential commercial information under § 4-335 of the General Provisions Article and not subject to public inspection." Abell argues that "the language in these statutes would be unnecessary if the General Assembly understood the MPIA's exemption to broadly cover any information the submitter treats as private." Again, we fail to see how the General Assembly incorporated a requirement of substantial competitive harm into GP § 4-335 by permitting an insurer to notify the Insurance Commissioner that it claims to have produced confidential commercial information or by permitting an insurer to request a finding that it has produced such information.

Abell also cites § 4-310(a) of the Insurance Article, which requires the Commissioner to preserve the confidentiality of reports regarding an insurer's capital levels because the reports "constitute confidential commercial information that might be damaging to the insurer if made available to the insurer's competitors." According to Abell, this statute "confirm[s] that the General Assembly understands the term 'confidential commercial information' to include a requirement of competitive harm." We are unpersuaded. A single statutory reference to the rather obvious likelihood of the damage resulting from the disclosure of an insurer's capital levels does not mean that information can qualify as confidential commercial or financial information under GP § 4-335 only if the owner is likely to suffer substantial competitive harm if the government discloses the information.

Finally, Abell argues that *Argus Leader* conflicts with a policy of interpreting the MPIA's "exemptions narrowly and in favor of disclosure." *See Fioretti v. Maryland*

38

*State Bd. of Dental Examiners*, 351 Md. 66, 77 (1998). The exemptions, however, are no less important than the disclosure requirements in a statute that endeavors "to strike a balance between government transparency and the protection of private commercial interests." *See Amster v. Baker*, 453 Md. at 71. Where the literal terms of an exemption require the government to withhold information, as they do here, the government must adhere to the exemption.

In any event, a policy argument that a statutory exemption should be circumscribed through the addition of language that the statute itself does not contain is best directed to the legislature, not to a court. "[J]ust as we cannot properly *expand* [GP § 4-335] beyond what its terms permit, we cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms." *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 439 (emphasis in original) (citation omitted).[20]

In summary, we are unpersuaded that there is any basis for us to employ the *National Parks* test, which has been rejected by all nine justices of the United States Supreme Court. We adopt the test for confidentiality that was set forth in *Argus Leader*: "At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of

---

[20] Abell also asserts that *Argus Leader* "would effectively allow the government to shield any information provided by a private business simply because the business asked it to." To the contrary, *Argus Leader* permits the government to withhold a business's commercial or financial information only if the information "is both customarily and actually treated as private by its owner. *See Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 440. *Argus Leader* obviously requires more than a mere request for confidentiality by a private business.

privacy, the information is 'confidential' within the meaning of [GP § 4-335]." *See Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 440.

It is beyond any dispute that the materials that the City withheld under § 4-335—the Developer's annual financial statements, the estoppel certificate, and the IRR analyses—are "confidential" under the *Argus Leader* test. In his affidavit, the Developer's representative testified that the Developer "would not customarily release those documents to the public," that it "ha[d] not [released] and would never release those documents to the public," that it had "conspicuously marked the documents as 'Confidential' and understood that the City would treat them accordingly," and that it had provided the IRR analysis to the City only after it understood that the City "recognized the sensitivity" of the analysis "and would protect it with the highest level of confidentiality." Similarly, in her affidavit, the BDC's representative testified that "privately-held companies" like the Developer "customarily never share these types of documents with the general public," that the documents "consist almost entirely of the private financial data of the Developer," that the Developer had "specifically requested" that the "documents remain confidential and not [be] publicly disclosed," and that the "documents were given to the City on the condition of confidentiality."

These assertions, which Abell did not dispute, establish that the documents in question are confidential commercial or financial information within the meaning of *Argus Leader* and of GP § 4-335. The circuit court, therefore, did not err in granting

40

summary judgment in favor of the City and the Developer on the question of whether the City was required to withhold those documents in response to Abell's MPIA request.[21]

## B. Even if the *National Parks* Test Applied, the Circuit Court Did Not Err in Holding that the City Properly Withheld Confidential Commercial or Financial Information from its MPIA Production

As an alternative ground for its decision, the circuit court opined that, even if the *National Parks* test applied to the materials that the Developer was required to provide to the City, the City would still have been obligated to withhold them because the undisputed facts in the record established the likelihood of substantial competitive harm if the materials were disclosed. The circuit court did not err in reaching that conclusion.

To establish the likelihood of substantial competitive harm, a party "need not demonstrate actual competitive harm." *Public Citizen Health Research Group v. National Insts. of Health*, 209 F. Supp. 2d 37, 46 (D.D.C. 2002). The party "need only demonstrate the existence of actual competition and the likelihood of substantial competitive injury." *Id.; accord New Hampshire Right to Life v. U.S. Dep't of Health and Human Services*, 778 F.3d 43, 50 (1st Cir. 2015); *Sharkey v. Food & Drug Admin.*, 250 Fed. Appx. 284, 288 (11th Cir. 2007); *Lion Raisins Inc. v. United States Dep't of*

---

[21] In the circuit court, Abell requested that the court permit it to conduct discovery to test the assertions in the affidavits of the Developer's representative and the BDC's representative. The circuit court declined that request. On appeal, Abell does not argue that the circuit court abused its discretion in declining to permit discovery. *See generally State v. Rovin*, 472 Md. 317, 351 (2021); *see also Goldner v. Social Security Admin.*, 293 F. Supp. 3d 540, 544 (D. Md. 2017) (stating that "'[d]iscovery in FOIA cases is rare and should be denied where an agency's declarations are reasonably detailed, [and are] submitted in good faith and the court is satisfied that no factual dispute remains[]'") (quoting *Schrecker v. United States Dep't of Justice*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002)).

41

*Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004); *Utah v. United States Dep't of Interior*, 256 F.3d 967, 970 (10th Cir. 2001); *Southern Alliance for Clean Energy v. U.S. Dept. of Energy*, 853 F. Supp. 2d 60, 71, (D.D.C. 2012); *Watkins v. U.S. Bureau of Customs and Border Protection*, 643 F.3d 1189, 1194 (9th Cir. 2011); *Boeing Co. v. U.S. Dep't of Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009).

The information that the Developer was required to provide to the City—the Developer's annual financial statements, the estoppel certificate, and the IRR analyses— are paradigmatic examples of documents whose disclosure is likely to cause substantial competitive injury. "[F]inancial statements," "audits of financial statements," and "audit analyses" are confidential financial information because their disclosure "could be used by a competitor" to create competition for the same types of contracts, and could therefore cause substantial competitive harm. *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 32 (D.D.C. 2000); *see also Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36-37 (D.D.C. 2009) (concluding that disclosure of information describing companies' "revenue, net worth, [and] income" could "harm the competitive position" of the companies); *100Reporters LLC v. United States Dep't of Just.*, 248 F. Supp. 3d 115, 143 (D.D.C. 2017) (stating that there was "little doubt" that a competitor could use information about a company's "finance structure, business partners, and customers" to the company's detriment).

Similarly, the disclosure of information that competitors could use to determine a business's profit margins would likely result in substantial competitive harm. *Public Citizen Health Research Group v. National Insts. of Health*, 209 F. Supp. 2d at 48-49

42

(stating that "courts in this circuit have held that information that competitors could use to derive a firm's profit margin constitutes serious competitive harm"); *McDonnell Douglas Corp. v. United States Dep't of Air Force*, 375 F.3d 1182, 1189 (D.C. Cir. 2004) (concluding that release of financial information that contained prices would likely cause company substantial competitive harm because it would likely allow competitors to underbid it); *Northrop Grumman Sys. Corp. v. Nat'l Aeronautics & Space Admin.*, 346 F. Supp. 3d 109, 119-21 (D.D.C. 2018) (stating that disclosure of company's rates could permit competitors to undercut contract bids).

In his affidavit, the Developer's representative testified that the financial statements showed annual income earned from rent and maintenance charges and the total net rentable square feet available in the Legg Mason Tower. He explained that the Developer's competitors could use this information "to calculate average rent and common area maintenance charges per square foot," allowing them to undercut rates and lure tenants away from Legg Mason Tower. He also explained that the financial statements revealed the length of the tenants' lease terms and that the disclosure of this information would provide competitors with the "insight" to focus marketing efforts to times when leases were set to expire.

The Developer's representative testified that knowledge of the average rent and common area maintenance charges would provide the Tower's tenants with "significant negotiating leverage," which would result in lower rental rates for the Developer. In addition, he testified that, as many of the Tower's tenants considered their rental rates

"strictly proprietary and confidential," the tenants "may elect not to renew their leases" if those rental rates were made public.

The Developer's representative also testified that the financial statements and IRR analyses included information about the Developer's "cash, equity, and reserve amounts," which would provide even more leverage to tenants in negotiations. This information, he testified, would also provide an unfair advantage to vendors in negotiating deals. For the same reasons, he stated that the estoppel certificate, which identified the Developer's equity, would also harm the Developer's position if released. The IRR analyses and financial statements identify profit margins, which, the representative said, could be used by tenants and vendors to "negotiate better prices for rent and service contracts."

According to the Developer's representative, the financial statements revealed the fees that the Developer paid to all its current vendors. The disclosure of this information, he testified, would harm the Developer's position, because any vendor from which it solicited a bid could learn what price the Developer pays and, consequently, would not bid lower. And as many of the vendors treated their rates as "strictly proprietary and confidential," they might "decide to stop doing business" with the Developer, he said, if their rates were disclosed.

In short, the affidavit established the likelihood that the Developer would suffer substantial competitive harm if its confidential commercial and financial information were disclosed.

Abell did not adduce any evidence controverting the assertions in the affidavit of the Developer's representative. Instead, Abell points with incredulity to certain information redacted in the financial statements—such as janitorial supplies and "window cleaning costs"—and suggests that it is "difficult to imagine" how such charges, taken alone, could cause harm. It argues that because some of the material sought is over ten years old, any harmful effect is attenuated. Finally, it argues that because the Developer sold its majority interest in the Legg Mason Tower, the Developer did not adequately explain how the disclosure of the information would result in substantial competitive harm.

Abell's counterarguments are unpersuasive. If window-cleaning companies learn what the Developer had spent to clean the windows at the Legg Mason Tower—a 24-story, glass high-rise office building—they would be unwilling to work for less at that building or any of the buildings owned by the Developer or its affiliates. It makes little difference that the confidential information is no longer current: tenants, competitors, and vendors can extrapolate from what the Developer did in the past in order to forecast what it or its affiliates are likely to do in the present. Similarly, it makes little difference that the Developer no longer owns a majority interest in the building: tenants, competitors, and vendors can extrapolate from what the Developer did at the Legg Mason Tower to forecast what it or its affiliates are likely to do at other properties. The circuit court did not err in concluding that, even if the *National Parks* test applied, the Developer would

likely suffer substantial competitive harm from the disclosure of confidential commercial and financial information.[22]

### C. The Circuit Court Did Not Err in Holding that the Exemption for Confidential Commercial or Financial Information and the Deliberative-Process Privilege Applied to the Model Analysis

The City withheld the model analysis, which used the confidential information from the IRR analyses to project the Developer's future earnings, on the basis of the exemption for confidential commercial or financial information and the deliberative-process privilege. The circuit court agreed that both applied.

It is beyond any dispute that the exemption for confidential commercial or financial information required the City to withhold some of the information contained in the model analysis. As the circuit court stated, the financial information in the model analysis "was derived directly from the financial statements and other financial information provided to the BDC by [the Developer]." The Developer provided that information voluntarily, to assist the City in deciding whether to accept a buy-out of its interest in the future profits from the Tower and the garage. Thus, even before *Argus Leader*, the City would not have been required to show a likelihood of substantial competitive harm under the *National Parks* test in order to withhold that much of the

---

[22] In *Argus Leader*, the dissenters agreed that the government need not prove that competitive harm would be "substantial" before it may withhold confidential commercial or financial information. *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. at 442 (Breyer, J., concurring in part and dissenting in part). Still, the dissenters asserted that the government must show "genuine" harm. *Id.* Because the City showed that the Developer faced a likelihood of substantial competitive harm because of the disclosure of the information in this case, the City certainly met the dissenting opinion's lower standard of proof of "genuine" harm.

46

model analysis.  Instead, the City would have been required to show only that the information "'would customarily not be released to the public by the person from whom it was obtained.'"  *Amster v. Baker*, 453 Md. at 81 (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d at 879).  The uncontradicted affidavit of the Developer's representative established that the Developer would not customarily have released the financial statements and other financial information to the public.  The affidavit also established that the Developer not only treated the information as confidential, but provided it to the City under assurances of confidentiality, thus also satisfying the *Argus Leader* test.

We turn to whether the City was entitled to withhold the rest of the model analysis under the deliberative-process privilege.

An agency may withhold records or information from public inspection "if it believes that disclosure 'would be contrary to the public interest.'"  *Glass v. Anne Arundel County*, 453 Md. 201, 210 (2017) (quoting GP § 4-343).  One such discretionary exception applies to interagency or intra-agency letters and memorandums that "would not be available by law to a private party in litigation with the unit."  GP § 4-344.  This privilege extends to materials that "contain pre-decisional deliberations."  *Glass v. Anne Arundel County*, 453 Md. at 210.

This deliberative-process privilege protects documents "'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Stromberg Metal Works, Inc. v. Univ. of Maryland*, 382 Md. 151, 165 (2004) (quoting *Nat'l Labor Relations Bd. v. Sears,*

47

*Roebuck & Co.*, 421 U.S. 132, 150 (1975)). To shield a record or part of a record under the deliberative-process privilege, "the agency ordinarily must establish that the record is both pre-decisional and deliberative." *Id.*

The distinction between "purely factual data," which generally does not qualify for the privilege, and "deliberative opinions," which do qualify, "is not always a clear one and is not rigid." *Id.* at 166. "'[S]ome factual material is entitled to a degree of protection under the privilege, although not to the same extent as opinions and recommendations[.]'" *Id.* (quoting *Hamilton v. Verdow*, 287 Md. 544, 564 (1980)). For example, "'facts obtained upon promises or understandings of confidentiality, investigative facts underlying and intertwined with opinions and advice, and facts the disclosure of which would impinge on the deliberative process" may be subject to the privilege. *Id.* (quoting *Hamilton v. Verdow*, 287 Md. at 565).

Abell argues that the circuit court erred in holding that the deliberative-process privilege applied to the model analysis because, it says, the analysis is not deliberative.[23] Abell argues that, under *Stromberg*, purely factual mathematical projections cannot constitute consultative views. Abell also argues that, to qualify for the privilege, a document must make recommendations, express opinions, or contain subjective personal thoughts.

---

[23] Abell made no argument in its brief concerning the circuit court's application of GP § 4-344 or GP § 4-343, which allow for the discretionary denial of internal agency records in accordance with litigation-type privileges if the denial would serve the public's interest. Nor did Abell argue in its brief that the model analysis was not pre-decisional. Based on these concessions, Abell is disputing only whether the model analysis is deliberative.

*Stromberg* involved an MPIA request for monthly reports related to the progress of a troubled construction project that was suffering delays and cost overruns. *Stromberg Metal Works, Inc. v. Univ. of Maryland*, 382 Md. at 154. A subcontractor requested the information, apparently because it was concerned about whether there was adequate funding to complete the project. *Id.*

The University of Maryland invoked the deliberative-process privilege to withhold a forecast of the project's final cost. *Id.* at 156, 157, 158. The forecast was prepared for a person "seven rungs down in the chain of command and responsibility within one State agency"; nothing in the record indicated that that person, on his own, had any relevant decision-making power; nor did anything in the record indicate that the information was "used, or even seen, by anyone up the line for their decision-making." *Id.* at 163. In these circumstances, the Court opined that the "underpinning" of the deliberative-process privilege, "if it exists at all, is exceedingly remote and tenuous." *Id*.

The Court went on to explain that the number was "largely factual in nature." *Id.* at 166. The number appeared in reports that "consist[ed] predominantly of factual information," which was "objectively ascertainable and documented, and [was] not at all deliberative in nature." *Id.*

That information did incorporate a subordinate's "estimates, predictions, or evaluations . . . as to the validity or value of pending or possible claims or the course of further construction[,]" and "to that extent, constitute[d] [the subordinate]'s 'views[.]'" *Id.* The report, however, contained no "clear articulation of those views"—no "analysis of pending or possible claims, or what remained to be done, or the extent to which further

49

construction would likely occur on schedule, or whether additional funding was necessary or should be sought, or whether the project should be scaled back, enhanced, or changed in some material way." *Id.* at 167. "The one aggregate number . . . allegedly incorporate[d] but [did] not identify or segregate" any "consultative views." *Id.* "It [was] impossible to tell from that number what [the subordinate's] views [were] with respect to any particular claim, much less whether the project should be altered or additional funding should be sought." *Id.* "The redacted number [did] not, therefore, constitute a memorandum that would not be available to a private party in litigation with the University and, accordingly, [was] not subject to shielding under the deliberative process privilege aspect" of the MPIA. *Id.*

This case is different from *Stromberg*. Rather than a report prepared for an employee "seven rungs down in the chain of command" and removed from actual decision-making authority, *id*. at 163, the model analysis was "put together by an Economic Development Director at the BDC" and was actually used "to fact-check the Developer's assumptions regarding . . . what a fair and advantageous price would be" and "to inform the City's negotiating position regarding the buyout." Rather than "largely factual" information associated with "one aggregate number[,]" *id.* at 166-67, the model analysis is a spreadsheet that uses a variety of algebraic formulas to predict economic outcomes based on a number of different scenarios. In essence, the model analysis is the functional equivalent of a narrative account of how much the profit-sharing arrangement was likely to generate under each of those scenarios.

50

In short, the information in the model analysis reflects the City's thought processes and deliberation in regard to whether to agree to a buy-out of the profit-sharing rights and how much to demand in exchange for such an agreement. Tellingly, the Developer's representative averred that if the MPIA did not protect the model analysis from disclosure, the Developer would have sought to obtain the analysis in order to use it to the Developer's advantage in the negotiations.

Because the model analysis contains deliberative analysis, because it was actually used in the deliberations and negotiations, and because it is based on confidential commercial information, the circuit court correctly concluded that the deliberative-process privilege and the exemption for confidential commercial or financial information applied. Therefore, the court correctly concluded that the City was entitled to withhold the document.

## D. The Circuit Court Did Not Err in Holding that Memorandums Written by City Lawyers Were Properly Withheld Under the Attorney-Client Privilege

The circuit court decided that the City appropriately withheld two memorandums on the ground of the attorney-client privilege. Abell does not take issue with the circuit court's discussion of the privilege as applied to the documents; instead, Abell argues that the court did not have enough information about the origin and author of the handwritten notes on the documents to determine whether the notes themselves qualified for protection. Abell suggests that because the City bore the burden of establishing that the memorandums qualified for the privilege, the court erred in granting summary judgment in the City's favor.

51

A custodian must deny inspection of any public record or part of the public record if "by law, the public record is privileged or confidential." GP § 4-301(a)(1). If a statute or common-law privilege "forbids disclosure of a record, or gives the agency discretion not to disclose the record, that other law controls disclosure of the record." *Glass v. Anne Arundel County*, 453 Md. 201, 209 (2017). "[A] record of a communication covered by attorney-client privilege would not be disclosed in response to a[n] [M]PIA request, unless the client waived the privilege." *Id.*

"Generally, the attorney-client privilege bars compelled disclosure, without the client's consent, of attorney-client communications made in confidence between the attorney and client." *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 690 (2000). Maryland courts have described the privilege in the following terms:

> "(1) Where legal advice of [any] kind is sought, (2) from a professional legal adviser in [the adviser's] capacity as such, (3) the communications relating to that purpose, (4) made in confidence[,] (5) by the client, (6) are at [the client's] insistence permanently protected, (7) from disclosure by [the client] or by the legal adviser, (8) except the protection [may] be waived."

*Harrison v. State*, 276 Md. 122, 135 (1975) (quoting 8 John H. Wigmore, *Wigmore on Evidence* § 2292 (McNaughten rev. ed. 1961)); *accord Greenberg v. State*, 421 Md. 396, 409 (2011); *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. 396, 415 (1998).

"Once the attorney-client privilege is invoked, the trial court decides as a matter of law whether the requisite privilege relationship exists, and if it does, 'whether or not any such communication is privileged.'" *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. at 415 (quoting *Harrison v. State*, 276 Md. at 136).

52

When records requested under the MPIA are withheld on the basis of the attorney-client privilege, a trial court may conduct an *in camera* inspection[24] of those records if the court believes that this "is needed in order to make a responsible determination on claims of exemptions." *Cranford v. Montgomery County*, 300 Md. 759, 779 (1984). *In camera* review is permitted when a party seeks judicial review of the denial of an MPIA request, as Abell has done in this case. *Lamson v. Montgomery County*, 460 Md. 349, 368 (2018).

The factors a trial court may weigh in deciding whether an *in camera* inspection is appropriate are "judicial economy, the conclusory nature of the agency affidavits, bad faith on the part of the agency, disputes concerning the contents of the document, whether the agency has proposed *in camera* inspection and the strength of the public interest in disclosure." *Cranford v. Montgomery County*, 300 Md. at 779. Judicial review "is appropriate where the submission of other evidence is not sufficient to evaluate a denial of an MPIA request." *Lamson v. Montgomery County*, 460 Md. at 368.

Here, the City identified the two memorandums in its *Vaughn* index. However, the City did not provide any testimonial support concerning the subject matter or purpose of the two documents, leaving the circuit court without sufficient evidence to evaluate the City's claim of attorney-client privilege. In these circumstances, the circuit court

---

[24] "*In camera* inspection is defined as: '[a] trial judge's private consideration of evidence.'" *Ehrlich v. Grove*, 396 Md. 550, 553 n.3 (2007) (quoting Black's Law Dictionary 775 (8th ed. 2004)).

53

appropriately ordered an *in camera* review, so that it could determine from the contents whether the attorney-client privilege applied.

After completing its *in camera* review, the circuit court determined that the documents were protected by the attorney-client privilege. Based on the documents' contents, the court determined that they were communications from an attorney for the City to clients—employees of the City's Department of Finance. The court found no indication on the memorandums suggesting they were shared with or created by a third person who was not the attorney or the client. The memorandums contain legal advice from the attorney, explaining how the property should be treated under the PILOT Agreement and how taxes and tax credits should be applied. Notes handwritten on each memorandum relate to the contents of the advice in each memorandum. Based on the context of the documents, the court concluded that they "relate[d] to" and were "integral to" the analyses in the memorandums.

In arguing that the circuit court erred in concluding, as a matter of law, that the attorney-client privilege applied to the two documents, Abell posits that the handwritten notes might simply have "recorded the unidentified reader's independent thoughts." Abell argues that the privilege "does not protect the mental impressions of individuals who may read" an attorney-client privileged communication.

Unlike Abell, the circuit court had the opportunity to review the documents. On the basis of its review, the circuit court was convinced that the handwritten notations were not the notetaker's independent impressions of the attorney's advice, but rather information "integral" to the advice that the attorney himself had given. We, too, have

54

reviewed the documents, which remain under seal. Based on our independent review, we cannot say that the circuit court erred in concluding, based on its *in camera* review, that the attorney-client privilege shielded the memorandums from disclosure.

### E. Because Abell Failed to Generate a Factual Dispute as to the Existence of Additional Documents, the Circuit Court was Not Precluded from Entering Summary Judgment

Finally, Abell argues that the court erred in granting summary judgment because, it says, it had requested "entire categories" of documents that the City did not identify in its *Vaughn* index. Abell asserts that the City was required by statute or policy to maintain those records and that the City's correspondence implied that those records existed.

According to Abell, the City failed to produce three categories of documents: (1) "the building's lease and lease terms, occupancy rates, debt information, and rent rolls"; (2) "an economic analysis of the project" that is "required by the PILOT program's enabling law"; and (3) "annual reports" about the project that the City was required to make to the General Assembly.

In asserting that the City possesses "the building's lease and lease terms, occupancy rates, debt information, and rent rolls," Abell seems to rely on an email from an attorney for the City, written in response to Abell's early requests for information. In that email, the attorney wrote that the exemption for confidential commercial or financial information would apply to Abell's request for "annual financial statements, lease and lease terms, occupancy rates, debt information, and rent rolls." The attorney did not say that the City actually possessed the "lease and lease terms, occupancy rates, debt information, and rent rolls," and there is no evidence that the City ever actually did.

55

The City agrees that it was required by statute to conduct an economic analysis of this proposed project before it entered into the PILOT Agreement. The City also agrees that the BDC conducted the required analysis. The City asserts, however, that the BDC "no longer has any of the working papers or other documents that show this analysis was performed." The City adds that it "could speculate as to the reasons *why* no such papers remain in its custody (poor data retention policies at BDC in 2006-2009, analyst turnover, computer issues, human error, etc.), but the only fact relevant to *this* appeal is that the City does not have the documents at issue." (Emphasis in original.) The City represents that it searched for the documents, but was unable to find them. Without commenting on why the City no longer had any of those documents in 2018, we can agree that Abell did not create a genuine dispute of a material fact by arguing that the City should still have had them.

Finally, the City agrees that it "*should*" have the reports that it was required to send to the General Assembly, but asserts that it does not. (Emphasis in original.) The City explains that, "[w]hile the law does create a duty for the City to file an annual report on all PILOT agreements, it appears that the agency responsible for doing so was unaware of that duty for the first decade of this PILOT agreement's existence." "Accordingly," the City says, "the first such report was filed in 2019." Without commenting on the City's decade-long failure to comply with a reporting requirement that was admittedly imposed by law, we can agree, again, that Abell did not create a genuine dispute of a material fact by arguing that the City should have prepared those reports.

56

The City cannot produce what it does not have.  Because Abell did not generate a factual dispute as to whether the City actually possessed the documents that Abell says the City withheld, the circuit court did not err in entering summary judgment in the City's favor.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**